UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA                    CASE NO.: 5:21-CR-00001-JA-PRL

V.

DUSTIN SANDIFORD,
_____/

## DEFENSE OBJECTIONS TO REPORT AND RECCOMENDATION AT DOCUMENT NUMBER 46

**COMES NOW** the Defendant, by and through undersigned counsel, hereby files the following written objections to the report and recommendation, and alleges:

1.    That on April 28, 2021, the Honorable Court conducted an Evidentiary Hearing of the Defendants first motion to suppress evidence filed at document number 40.

2.    That on May 4, 2021, the Honorable Court entered a report and recommendation at document number 46.

3.    The Honorable Court made a ruling that the motion to suppress evidence should be denied.

4.    The defense was given 14 days to file a written objection to the report and recommendations.

1

5.      The defense does hereby object to the factual findings and legal conclusions the Honorable

        court cited in the report and recommendation.

6.      The Defense objects to the first motion to suppress evidence being denied by the Honorable

        Court.

7.      The defense has ordered the transcript of the motion to suppress hearing, pursuant to Rule of

        Criminal Procedure 59 (b)(2), held on April 28, 2021.

8.      The defense objects to the finding that the search warrant for the phone allowed the agents

        to search the "mega account" which is a cloud based storage application. The warrant did

        not allow for searching items not on the phone. In addition, the defense objects because

        Mega Servers are based in foreign countries. The defense objects and alleges that the agents

        went beyond the scope of the phone warrant. The agents put on and took off the airplane

        mode setting on the seized phone. The testimony at the hearing was that the alleged

        contraband was not visible on the phone without an internet connection. Therefore, the

        Mega account video was not stored on the phone and agents exceeded the scope of search.

        The defense argues a separate warrant was needed to search overseas accounts like Mega.

        See attachment.

9.      The report and recommendation is objected to in the aspect of the Defendant not consenting

        to the pat down search. The Defendant testified the phone was taken from him after a pat

down search, and not handed over to the agents by the Defendant. The defense objects that the warrant did not grant the authority to the FBI to pat down the Defendant for the purpose of locating the phone, making the seizure illegal.

10.    The Defendant objects to the court finding that a phone number can only be assigned to one phone at a time, which overlooks the defense argument that "spoofing" can occur. The testimony at the hearing is that technology can "spoof" a phone number or a cell phone to make it appear it is coming from a different phone, therefore appearing that more than one phone is utilizing the same number to call and text. The court made no finding that the FBI did  attempt to make a controlled call to verify the number was actually the Defendants. The agents relied on testimony of confidential witnesses to ascertain the phone number information.

11.    The defense objects to the court finding that the master affidavit and warrant itself satisfy the particularity requirement and that in fact the Defendants 4th Amendment rights were violated. The description of the phone in question was incorrect in both the master affidavit and the search warrant attachment also.

12.    That the defense objects to the court finding that the master affidavit and attachment B were valid and correct documents. In paragraph 2, of attachment B, it only authorized search of the installed computer software and does not mention internet applications. That the

3

definitions in the affidavit documents do not mention applications either. On page 7, Paragraph 17, it discusses records found on the device and the Mega account requires in internet connection and is not on the device. Nothing in the warrant authorized the search of the mega application, see attachment.

13.   The defense objects to the report and recommendation and argues the seized phone and all evidence obtained from it should be suppressed. That any and all evidence seized from the residence should also be suppressed.

## **MEMORADUM OF LAW**

The defense argues that the caselaw contained in the first motion to suppress evidence and all the grounds alleged in the first motion to suppress evidence are also all applicable to these objections. The defense adopts the all facts stated in the motion to suppress evidence, all the grounds in the motion to suppress evidence as well as all the arguments made and the memorandum of law in the motion to suppress evidence. The defense also argues all the oral arguments made by the defense at the motion to suppress hearing and the testimony of the Defendant apply to the objections. The defense also adopts the cross examination of Agent Moreno and direct examination of Agent Burros to be included in the objections filed above.

WHEREFORE, the Defendant hereby files the objections to the report and recommendation.

4

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 17, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: United States Attorney, further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following: none.

/s/ Michael W. Nielsen, Esquire

_____

MICHAEL W. NIELSEN, ESQUIRE
NIELSEN LAW FIRM
720 West State Road 434
Winter Springs, Florida 32708
(407)327-5865 [FAX(407)327-0384]
Attorney for Defendant
Florida Bar No.: 0794392
nielsenlaw@cfl.rr.com

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    5:20-mj-1183-PRL |
| Cellular telephone assigned call number (352) 364-1308 | ) ) ·) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Middle _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

**See Attachment A2**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**See Attachment B**

**YOU ARE COMMANDED** to execute this warrant on or before  12 | 15 | 20  *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Philip R. Lammens _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   12 | 1 | 20 @ 11:05am _____
*Judge's signature*

City and state:   Ocala, FL _____        Hon. Philip R. Lammens, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>5:20-mj-1183-PRL | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A2**

**PHONE**

<u>PROPERTY TO BE SEARCHED</u>

The property to be searched is a cellular telephone assigned the unique call number of (352) 364-1308, in the possession of Dustin Sandiford.  It is believed to be manufactured by LG and operate on the Android operating system, but its specific make, model, and serial number are currently unknown.

This warrant authorizes the forensic examination of this property for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including without limitation any and all disk drives, compact disks, flash drives, cellular telephones, personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs, including, but not limited to, P2P software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including, but not limited to, the United States Mail or computer) any child

3

pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital-data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

4

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase,

sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6

17.     All records on the device described in Attachment A2 that relate to violations of 18 U.S.C. § 2252A and involve Dustin Sandiford, including:

a.     All electronic evidence, including evidence that has been edited or deleted, included in the categories described in Paragraphs 2 through 16 above.

b.     Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c.     Records evidencing the use of the Internet to communicate with data servers (including those operated by T-Mobile) including:

i.     records of Internet Protocol addresses used;

ii.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have

7

been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**STATE OF FLORIDA**

**COUNTY OF MARION**

Case Nos:   **5:20-mj-1174-PRL**
             **5:20-mj-1183-PRL**

## MASTER AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Steve Burros, being duly sworn, state as follows:

## INTRODUCTION

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation
(FBI) and have been so employed since February 2000 when I began my training at
Quantico Virginia. Accordingly, I am a "Federal Law Enforcement Officer" within
the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am currently
assigned to the Jacksonville, Florida Division of the FBI where I conduct a variety of
investigations in the area of violent crimes.  A portion of my duties are dedicated to
investigating cases involving crimes against children under the auspice of the FBI's
"Innocent Images" National Initiative.  In the performance of my duties, I have
investigated and assisted in the investigation of criminal matters involving the sexual
exploitation of children which constituted violations of 18 U.S.C. § 2252A as well as
Florida state statutes which criminalize the possession, receipt and transmission of
child pornography, that is, visual images depicting minors engaged in sexually
explicit conduct. I have been involved in numerous searches as both a supervisor
and agent pertaining to the possession, collection, production, and/or transportation
of child pornography through either the execution of search warrants or through the
subject providing written consent to search.

2.      The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers and personnel. This affidavit is being submitted for the limited purpose of securing search warrants, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence of violations of 18 U.S.C. § 2252A are present in the residence and target cell phone to be searched.

## STATUTORY AUTHORITY

3.      This investigation concerns alleged violations of 18 U.S.C. § 2252A. Based upon my training and experience, I know the following:

a.      18 U.S.C. § 2252A(a), in pertinent part, prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

b.      18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape,

2

computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

  c.  The internet is a facility of interstate commerce.

## DEFINITIONS

4.  The following definitions apply to this Affidavit:

  a.  "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

  b.  "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in

3

sexually explicit conduct).  See 18 U.S.C. §§ 2252 and 2256(2).

      c.      "Visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means that is capable of conversion into a visual image, and data that is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format.  See 18 U.S.C. § 2256(5).

      d.      "Computer," as used herein, pursuant to 18 U.S.C. § 1030(e)(1), is "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      e.      "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

      f.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external

4

hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.     The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

h.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware,

5

software, or other programming code. A password (a string of alphanumeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      i.     "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a unique and different number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

      j.     "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of

6

capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

      k.    A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      l.    A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.

7

This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

5.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Computer storage devices (e.g., hard drives, compact discs, tapes, etc.) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires the searching authorities to examine all of the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and generally would be impossible to accomplish on-site; and

b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The

8

vast array of computer hardware and software available requires computer experts to specialize in certain systems and applications, thereby making it difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to complete and accurate analysis of the computer evidence.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

6.     Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents in the area of investigating cases involving sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a.     Many individuals who traffic in and trade images of child

9

pornography also collect child pornography.  Many individuals who collect child pornography have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

           b.        Many individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.  Most of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children.

           c.        Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support.  This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior.  The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

           d.        Many individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector),

10

in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

  e.  Many individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

  f.  Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb

11

drives, and removable hard drives, which can be very small, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet. Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, or distribute child pornography by computer using the Internet often maintain or possess the items listed in Attachment B.

7.      As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials. For example, I am familiar with the facts of an investigation conducted in the Middle District of Florida. In that investigation, the subject had his residence searched pursuant to a federal search warrant and his computer and digital storage media seized by the FBI. The search of his computer and other computer storage media revealed the subject knowingly possessed several thousand images of child pornography. The subject retained an attorney and both were made aware of the ongoing investigation into the subject's commission of federal child pornography offenses. Approximately two months later, the subject was arrested on federal child pornography possession charges. After the subject's arrest, the FBI obtained a laptop computer owned by the subject's employer but possessed

12

and used by the subject both before and after the execution of the search warrant at his residence. Subsequent forensic examination of this computer revealed that the subject had downloaded, possessed and viewed images of child pornography numerous times *after* the execution of the search warrant and before his arrest.

8.     Based on my training and experience, as well as conversations with other experienced law enforcement officers and forensic computer examiners, I also know that with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals have also been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis. However, as referenced above, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Furthermore, even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favored images involving a particular child or act is often maintained on this device.

## BACKGROUND OF INVESTIGATION AND
## FACTS ESTABLISHING PROBABLE CAUSE

9.     I make this affidavit in support of two search warrants. The first warrant is for the premises located at 9465 North Argo Way, Citrus Springs, FL 34434 ("the residence"). The residence is located in Citrus County, within the

13

Middle District of Florida. The residence is more fully described (including photographs) in Attachment A1, which is incorporated by reference. The FBI is investigating the current occupant of the residence, Dustin Sandiford, for violations of 18 U.S.C. § 2252A. The second warrant is for a cellular telephone assigned the unique call number (352) 364-1308 ("the target cell phone"). The target cell phone more fully described in Attachment A2, which is incorporated by reference. The target cell phone is serviced by T-Mobile, and is believed to be regularly used by Sandiford to possess, view, and possibly produce child pornography, as detailed further below.

10. On October 27, 2020 a subpoena was issued to T-Mobile for the target cell phone. As a result, T-Mobile informed the FBI that the subscriber of the phone was G.L. of Citrus Springs, Florida. G.L. was later identified as Sandiford's employer (see below).

## CONFIDENTIAL WITNESS 1

11. On September 22, 2020, I spoke with a Confidential Witness (CW-1). CW-1 has known Sandiford personally for approximately 13 years.[1] CW-1 told me that Sandiford would "hang out" with minor females and purchase alcohol for them

---

[1] CW-1 has no known prior criminal convictions. CW-1 is not providing information to the FBI in exchange for compensation or for the hope of favorable treatment in a current or anticipated criminal prosecution. The information provided by CW-1 has been corroborated by the statements of other CWs, police reports, and other aspects of the investigation.

14

when Sandiford was approximately eighteen years old. CW-1 explained that one instance of Sandiford's sexual activities with a minor female during this period resulted in him being charged by the Citrus County Sheriff's Office (CCSO). I later confirmed this information by checking court records, and found that Sandiford had been arrested by CCSO for Sexual Battery on a Minor (against CW-3), and was ultimately convicted of Felony Battery based on these same facts on October 7, 2008.

12.     Per CW-1, Sandiford engaged in a sexual relationship with her shortly after Sandiford was released from jail, while CW-1 was still a minor. During this time, Sandiford took numerous explicit photographs of CW-1, which he retained and kept on a computer in the residence. CW-1 related that she is now an adult and has not had a relationship with Sandiford for at least eight years. However, CW-1 showed me a screen shot of a web site named "Omegle," which depicted CW-1 exposing her breasts when she was approximately 17 or 18 years old. According to CW-1, Sandiford sent this screenshot to CW-1's mother. Sandiford told CW-1's mother that he had posted the illicit picture of her daughter on the site where it was publically available.

13.     CW-1 also described a recent exchange through social media in which someone using the Facebook Messenger username of "masonmasonmasonmason" (hereinafter "mason") told CW-1 that Sandiford had solicited him to befriend CW-1 on social media in order to obtain nude pictures of CW-1 and CW-1's minor daughter. Sandiford had sent mason nude photographs of girls apparently between

15

nine and fifteen years of age, and expected mason to reciprocate by passing along any photographs of CW-1 and her daughter he managed to obtain/ CW-1 showed me screenshots she had received from mason corroborating this account. The screenshots showed an exchange between Sandiford and mason, with Sandiford claiming he had nude photographs of another person, a 15-year-old relative, on his phone, and that if mason sent him "something that was undeniable," then Sandiford would send mason "the mother-load."

14.     During the Facebook Messenger exchange, Sandiford used the username of "Johnny Money." CW-1 explained that she believed Sandiford was using the Johnny Money username because she was aware of a Tik Tok account using the same name. That account, likely also operated by Sandiford, followed the Tik Tok accounts of CW-1, CW-1's minor daughters, and Sandiford's minor cousin, all of whom were referenced in the Facebook Messenger exchange/ CW-1 also believed that Sandiford had social media accounts under the name "JohnnyMonet2020."

## CONFIDENTIAL WITNESS 2

15.     I spoke with a second confidential witness (CW-2) on September 22, 2020. CW-2 knows Sandiford personally and has known Sandiford since he was approximately fifteen years old.[2] CW-2 told me that Sandiford had molested

---

2 CW-2 has prior criminal convictions for grand theft and criminal mischief. CW-2 was also arrested for alleged misdemeanor battery against Sandiford in April 2020, and no longer

Sandiford's younger sister when Sandiford was approximately thirteen or fourteen years old. CW-2 was unsure if the incident had ever been reported to the authorities, but said he/she knew about it because of his/her close relationship with Sandiford's family.

16.     CW-2 stated that he/she lived with Sandiford and Sandiford's grandmother in a rented room at the residence described in Attachment A until Sandiford's grandmother died. Sandiford then inherited the property after his grandmother's death. CW-2 explained that he/she was homeless earlier this year, but had asked Sandiford if he/she could move back into the residence. CW-2 moved back into the previously-rented room at the residence with Sandiford's approval in March 2020.

17.     While living in the residence with Sandiford in or around March 2020, CW-2 saw Sandiford using methamphetamine and cocaine on numerous occasions. CW-2 also personally observed Sandiford watching pornography on a red laptop computer while sitting in the living room. Sandiford would frequently show CW-2 photos of naked girls that he had on his cell phone (believed to be the target cell phone), including one of a 14-year-old female relative/ CW-2 explained that

_____

lives at the residence. The misdemeanor battery case is pending, and FBI SA Burros has clearly explained to CW-2 that any information he/she provides in connection with this investigation will have no effect on the outcome of her misdemeanor prosecution. Accordingly, CW-2 is not providing information to the FBI in exchange for compensation or for the hope of favorable treatment in a current or anticipated criminal prosecution. The information provided by CW-2 has been corroborated by the statements of other CWs, police reports, and other aspects of the investigation.

17

Sandiford bragged about having this picture and showing it to others; he also claimed to CW-2 that others had offered him $1,000 to produce a pornographic video with the relative. Sandiford showed CW-2 another video of a 13-year-old girl performing oral sex on him. CW-2 recognized the girl in the video, who is now an adult.

## CONFIDENTIAL WITNESS 3

18.     On October 5, 2020, I spoke with Confidential Witness 3 (CW-3). CW-3 knows Sandiford personally since she was approximately twelve years old and he was approximately eighteen years old.[3]

19.     CW-3 said her school bus stop was in Sandiford's front yard (the residence described in Attachment A) and he would come hang out with her and other kids while they were waiting for the bus or when they got off the bus to go home. Sandiford would purchase alcohol and cigarettes for CW-3 and some of the other girls/ CW-3 advised some of the kids thought it was weird that Sandiford wanted to hang out with them, but she and others were okay with Sandiford since he was buying them cigarettes and alcohol.

20.     CW-3 told me about a time in the past when she, Sandiford and others went into the woods behind Citrus Springs Park to an area known to them as "Ground Zero." While in the woods, Sandiford provided alcohol to her and other

---

3 CW-3 has no known prior criminal convictions. CW-3 is not providing information to the FBI in exchange for compensation or for the hope of favorable treatment in a current or anticipated criminal prosecution. The information provided by CW-3 has been corroborated by the statements of other CWs and other aspects of the investigation.

18

minors.  After CW-3 drank too much alcohol, Sandiford led her away from the others, after which she believes she passed out.  When CW-3 regained consciousness, she discovered that she was wearing all her clothes, but her underwear had been removed.  Sandiford told CW-3 that he had undressed her bottom half while she was unconscious, digitally penetrated her, and performed oral sex on her.

## CONFIDENTIAL WITNESS 4

21.     On October 5, 2020, I spoke with Confidential Witness 4 (CW-4), who has known Sandiford for the past two years.[4]  CW-4 met Sandiford through a mutual friend.

22.     CW-4 explained that Sandiford has messaged him/her on Facebook Messenger to say that Sandiford knows a guy who is willing to pay money for pictures of nude girls.  Sandiford asked CW-4 if he/she was interested in getting nude photographs of girls for money.  Sandiford said this individual liked his girls "a little younger" and gave this individual's Snapchat screen name as "JohnnyMonet2020" (a name CW-1 identified as used by Sandiford on social media).

---

[4] CW-4 has no known prior criminal convictions.  CW-4 is not providing information to the FBI in exchange for compensation or for the hope of favorable treatment in a current or anticipated criminal prosecution.  The information provided by CW-4 has been corroborated by the statements of other CWs, police reports, and other aspects of the investigation.

19

23.    CW-4 did make contact with "JohnnyMonet2020" on Snapchat and was advised she would receive $100 for every picture of a nude girl she sent between the ages of 14 and 17, but the pictures had to be good and had to show genitals. CW-4 did not provide any pictures to the account, because he/she concluded that "JohnnyMonet2020" was actually Sandiford after viewing the account's followers list (which included Saniford's underage daughters and CW-1).

## CONFIDENTIAL WITNESS 5

24.  On October 5, 2020, I spoke with Confidential Witness 5 (CW-5), who has known SANDIFORD since he was approximately twenty-one years old.[5]  CW-5 communicates with Sandiford through Facebook Messenger, but does not have his cellular phone number.  CW-5 told me that Sandiford still lives at the residence described in Attachment A.  CW-5 mentioned that there had been a fire in the residence's kitchen. Due to the resulting damage, Sandiford occasionally uses the shower at his neighbor's residence.

25.    CW-5 believes Sandiford works at a bar in Citrus Springs close to the residence.  CW-5 has seen Sandiford post a picture of himself on social media wearing a shirt with the bar's logo on it and believes he works there as a bouncer. Per CW-5, Sandiford also does work for a local landscaping service when he needs

---

5 CW-5 has no known prior criminal convictions.  CW-5 is not providing information to the FBI in exchange for compensation or for the hope of favorable treatment in a current or anticipated criminal prosecution.  The information provided by CW-5 has been corroborated by the statements of other CWs and other aspects of the investigation.

extra money. The owner of the landscaping service is G.L., who is also named as the subscriber to the target cell phone (as described in Paragraph 10).

## INFORMATION ABOUT THE TARGET CELL PHONE

26.    Per records provided by T-Mobile in response to an administrative subpoena, the target cell phone's account has been active since January 1, 2020. Although the subscriber is G.L. (Sandiford's employer), investigators believe Sandiford is the actual user and possessor of the device. This conclusion is supported by information provided by the CWs, as detailed further below.

27.    CW-1 initially provided investigators with the target cell phone's call number. CW-1 stated that CW-1's mother received a text message from Sandiford from this call number attempting to contact CW-1. CW-1 provided investigators with a screenshot of this text message exchange. CW-2 described Sandiford's cellular phone as an LG, Android-based cellular phone which Sandiford's grandmother had purchased him shortly after he was released from jail/

28.    While CW-4 did not communicate with Sandiford directly using the phone's call number (either by voice communication or text message), CW-4 recalled that his/her communications with Sandiford were all through cellular phone applications.

29.    On October 22, 2020, CW-5 verified that Sandiford used the same call number assigned to the target cell phone, and confirmed that Sandiford himself had provided that number. CW-5 further stated that Sandiford does not currently have

21

electrical service at his residence, and consequently he has to use his cellular phone for all of his communications.

30.     Based on my training and experience, I know that electronic devices (including cellular telephones such as the target cell phone) can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

## CONCLUSION

31.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computers and/or internet-enabled electronic devices and/or storage media located in the residence at 9465 N. Argo Way, Citrus Springs, Florida 34434 more fully described in Attachment A1, to receive, distribute, and possess child pornography. I also have probable cause to believe that an individual has used or is using the cellular telephone more fully described in Attachment A2 to receive, distribute, and possess child pornography. Therefore, I have probable cause to believe the residence and item described above contain fruits, evidence, or instrumentalities of violations of 18 U.S.C. § 2252A, and that the items more fully described in Attachment B to this affidavit (which are incorporated by reference), will be located in the residence.

32.     Accordingly, I respectfully request that search warrants be issued by this Court authorizing the search of the premises described in Attachment A1 and the

22

search and seizure of the items listed in Attachment B, and authorizing the search of

the target cell phone described in Attachment A2 and the subsequent search and

seizure of the items listed in Attachment B.

Steve Burros, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
_____ day of November, 2020, at Ocala, Florida.
December

PHILIP R. LAMMENS
United States Magistrate Judge

23